JOHN BONER *et al.*, Plaintiffs-Appellees, *v.* NOLAN B. JONES, Director of the Department of Personnel, Defendant-Appellant.—(ALAN J. DIXON, Secretary of State, Intervening Plaintiff-Appellee; JOHN MASON *et al.*, Intervening Defendants; DELOIS PETERSON *et al.*, Intervening Defendants-Appellants.)

Fourth District   No. 14355

Opinion filed January 13, 1978.

GREEN, P. J., concurring in part and dissenting in part.

Richard A. Hollis, of Springfield, for appellants Delois Peterson *et al.*

William J. Scott, Attorney General, of Chicago (Mary F. Stafford, Assistant Attorney General, of counsel), for appellant Nolan B. Jones.

Nelson Howarth, of Howarth & Howarth, and Herman Bodewes, both of Springfield, for appellees.

Mr. JUSTICE WEBBER delivered the opinion of the court:

This seemingly endless litigation moves at its oblomovian pace into this, its fourth appearance, in the reviewing courts of the Illinois and Federal systems. Its seed was planted with the death of Paul Powell, Secretary of State, In October 1970; we trust, however wistfully, that this appeal will mark its obsequies.

A single question is involved: Did the trial court, upon remand from the supreme court, follow that court's mandate?

The factual background has been set forth completely in the supreme court opinion, *Boner v. Jones* (1975), 60 Ill. 2d 532, 328 N.E.2d 548, and will not be reiterated here except for such portions as may be required in the interest of clarity in this opinion.

The order appealed from is a permanent injunction restraining the defendant Director of Personnel from certifying under the Personnel Code certain employees in the office of the Secretary of State. Originally, it applied to all employees involved in this litigation, but by agreement, as hereinafter detailed, it was dissolved as to certain groups, but continued as to others.

Also, in the interest of clarity, we feel it necessary to identify the parties and their positions in this appeal. Boner *et al.*, original plaintiffs, are former employees of the Secretary of State who were terminated before the Personnel Code was extended into that office to include them. They are appellees here. After the first remand from the supreme court, the Secretary of State was permitted to intervene as a party-plaintiff. He so remains and is an appellee here. About the same time, the Illinois State Employees Association was likewise permitted to intervene but it has dropped out and is no longer a party.

The original defendant was the Director of the Department of Personnel. He remains in the suit, and is an appellant here. Following the second remand, several employees of the Secretary of State who took qualifying examinations after the extension of the Personnel Code, but who were terminated because of the order of the trial court of November 30, 1972, were permitted to intervene as defendants. These are Peterson *et al.*, and they are appellants here.

The definitions of several terms used in the argot of the Department of Personnel will be useful here:

> "similar employees" or "similar positions": employees performing functions which are common to many departments of state government.
>
> "dissimilar employees" or "dissimilar positions": employees whose functions are limited to the office of the Secretary of State.
>
> "qualifying examination": an examination given to an employee already on the job for purposes of retaining the job.
>
> "open examination": an examination given to persons seeking to obtain a particular job.
>
> "cutting score": the minimum score needed to pass either examination in order either to hold or to obtain the job.

Upon the second remand, the trial court ordered the Director of Personnel to provide a summary of all positions in the Office of the Secretary of State for which examinations had been administered and the cutting scores for each. That summary was filed with the trial court and involves 80 positions, almost 3,000 employees, and consists of 263 pages.

For convenience, the trial court caused the positions to be divided into five groups, labelled A, B, C, D, and E, and they were thereafter throughout the record so referred to. The trial court further ordered the parties to examine the data and arrive at whatever areas of agreement, compromise and difference they might be able.

Group A comprised the largest number of positions and the largest number of employees, approximately 60% of the total involved. These were all similar positions and the trial court established cutting scores for each of them with the agreement of the parties. These scores and these employees are not involved in this appeal.

Group B presented the trial court with a more complicated problem. It consisted of approximately 85 employees of professional status for whom no objective examinations had been administered. Instead, such employees were given a training and experience examination (referred to in the record as TRAEX). All were similar positions. The TRAEX was an oral affair during which the employee described his position and was thereafter assigned to a job classification. Thus, the employee himself was

able to control his classification, and a wide area of disagreement, stemming from differences in conclusions and lack of understandable technique in certifying professionals, was opened up.

At the suggestion of the trial court, the Department of Personnel sent letters to all employees who qualified for Group B. Some did not respond; those who did were interviewed and classifications established as a part of the court's order. Certain ones were not certified because either they did not respond to the letter, or the jobs were not of the TRAEX variety; others were not certified because they were found to lack the necessary training and experience or because they were expressly excluded as division heads or policy positions not subject to the requirements and erroneously included in the list.

Appellants attack the trial court's order as it relates to Group B on two grounds: (1) generally, in that the mandate did not permit the trial court to establish classifications, and (2) specifically, in that the trial court failed to certify one Sammy Thiemes as a Administrative Assistant II.

Groups C, D, and E consist of dissimilar positions. The trial court established cutting scores for Group E and it is not involved in this appeal. The principal controversy centers around Groups C and D which comprise about 33% of the total employees involved.

The trial court found that it was unable to establish cutting scores for Groups C and D for reasons which will be more extensively explored hereinafter and thereupon refused to do so. Appellants attack this action as a further violation of the mandate.

In connection with its refusal to establish cutting scores for all of Groups C and D, and many positions in Group B, the trial court likewise rejected suggestions by the Director of the Department of Personnel that category ranking systems be established for all positions in Groups C and D. Suggested percentages were 30%, 40%, and 30%, the first two being preferred categories and the last 30% being failures. Since we agree with the trial court that such a system would be improper, we shall not pursue the mechanics in detail; suffice it to say, the category ranking system is akin to what was called in an earlier day "grading on the curve."

The intervening defendants, Peterson *et al.*, made suggestions to the court which were likewise rejected. In substance, these were to take the qualifying examinations and the open examinations and by a system of mathematical ratios arrive at a cutting score. We likewise agree that this would be improper.

Both of the foregoing propositions are argued on appeal, along with the matters concerning Group B as detailed above and the rejection of Groups C and D. The answers to these and all questions raised can easily be disposed of once the fundamental question is answered, and that is the scope of the supreme court's mandate on the second remand. Appellants

argue that it was limited: that the trial court had one duty, and one duty only, that was to fix cutting scores, a purely mechanical matter, and it was error to do *anything* else. Appellees, on the other hand, argue that the mandate was broader than a simple arithmetical calculation and that the trial court performed his duty properly in considering the evidence, finding that the establishment of cutting scores required more than a wooden approach and concluding that certain scores could not be fixed legally upon the data presented.

Before proceeding further it will be useful to recapitulate briefly the history of the case, especially as to theories advanced by various parties from time to time. The first suit filed was by Boner *et al.* against the Director of Personnel in Federal District Court which rendered summary judgment for the Director. This was reversed by the United States Court of Appeals, holding that plaintiffs were discharged on account of an "impermissible basis," *i.e.*, membership in a political party. Then the instant suit was filed in the circuit court of Sangamon County between the same parties. The trial court entered a temporary injunction restraining the Director from extending the Personnel Code into the Secretary of State's office. About the same time leave was granted to the Secretary of State to intervene as a party-plaintiff and to the Illinois State Employees Association as a party-defendant. The question of the temporary injunction was carried to the supreme court which affirmed and remanded in *Boner v. Drazek* (1973), 55 Ill. 2d 279, 302 N.E.2d 280.

Following remand, and after various hearings among the same parties, the trial court entered summary judgment for the plaintiffs, holding two propositions in substance as follows: (1) The extension of the Personnel Code was invalid as an encroachment by the Governor upon the Secretary of State, or in the alternative (2) the treatment of examination scores by the Department of Personnel was in violation of section 4b of the Personnel Code (Ill. Rev. Stat. 1971, ch. 127, par. 63b104b). This was appealed by the Illinois State Employees Association and resulted in the remandment now in question.

Following remand, the Association dropped out of the case, having apparently obtained the relief it sought, *viz.*, extension of the Personnel Code into the Secretary's office. No question has been raised in this appeal as to the validity of that extension, only as to the method of its application. It was not until after the present remand and after the Association had withdrawn from the case that the new intervenors, Peterson *et al.*, entered in.

Thus, when the trial court undertook to comply with the mandate, he had before him as plaintiffs the original ones, Boner *et al.*, and the Secretary of State and as defendants the new intervenors and the Director of the Department of Personnel who had not appealed the summary

judgment order. He further had before him what was almost a new lawsuit. The prior proceedings had concerned themselves almost entirely with the validity of the extension. That was laid to rest within the supreme court's second opinion, *Boner v. Jones* (1975), 60 Ill. 2d 532, 328 N.E.2d 548, but the same opinion and the mandate raised the whole problem and question of cutting scores.

As indicated in the supreme court opinion, the trial court rendered a summary judgment "after considering the interrogatories and their answers and the affidavits." The record in the instant appeal from the proceedings after remand is voluminous, consisting of some seven volumes, together with supplemental exhibits covering hundreds of pages. Even the excerpts from record lies over three inches thick. Clearly, the child outgrew the parent and this is only further indication that the whole nature of the litigation had changed upon its return to the trial court. This can also be observed in some of the remarks of the trial judge. At the outset he apparently believed that he had a simple mechanical task, but as the evidence unfolded, he became aware that he was dealing with a Chinese puzzle.

Most of the evidence concerned itself with Groups C and D; Groups A and E were handled by stipulation. It consisted of oral testimony and affidavits from a number of persons. No useful purpose would be served by an extended recitation of this evidence but a brief synthesis of it is as follows: Manuele London, assistant professor of business administration at the University of Illinois, testified that he had examined the open and qualifying examinations and found substantial differences in them relating to type of test, time allocations for subparts, and the total tests and contents. He stated that the qualifying examinations, when compared with the open, measured different concepts and were not equivalent as to what was measured.

Walter Peura, division manager, selection and employment services in the Department of Personnel, testified that the category ranking system was geared to placing individuals on an eligibility list and therefore had no application to the qualifying examinations. He further testified that passing scores were different for open and qualifying examinations. His further testimony revealed that the category ranking system was purely arbitrary with no single formula in existence except at the whim of the Director who could establish from time to time a 50-50, a 10-70-20, a 25-30-40-5 ratio, or any other combination as he saw fit.

Charles Brunk, research and test division of the Department of Personnel, testified that the current ranking system to be 25% well-qualified, 30% qualified, 40% minimally qualified, and 5% failure. He further testified that in 1975 the percentages were 30, 40, and 30.

Steven Nettles, personnel analyst in the Department of Personnel,

testified that the category ranking system did not apply to the score but to the number of persons taking the examination.

Mary Riemann, administrative clerk in the Department of Personnel, presented records relating to certain positions; for example, varying cutting scores were established from time to time for Drivers License Hearing Officer and Drivers License Examiner II: Hearing Officer in October, 45, but reduced to 36 in December; Examiner II in September 1972, cutting score 67, in December, 58. She further testified that in December, 19 persons took the examination and 18 passed—no failures and one incomplete. As to Drivers License Examiner III, 29 took the open examination with 18 passing in the month of September and in the month of December, 17 took it, with 10 passing.

All of this leads to a central issue in this appeal. Under the evidence the trial court held that there had been a violation of section 4b of the Personnel Code and hence in good conscience he could not establish cutting score for Groups C and D. That section reads as follows in part:

> "Such qualifying examinations shall be of the same kind as those required for entrance examinations for comparable positions."

Appellants argue that the trial court had no business whatever concerning himself with that statute and in doing so he violated the mandate. And this leads to the basic query set forth above: What was the scope of that mandate?

> The mandate itself appears in routine form:
> "THEREFORE, it is considered by the Court that the judgment of the Circuit Court of Sangamon County, in this behalf rendered, BE AFFIRMED IN PART AND REVERSED IN PART in the respects set out in the opinion of this Court, and that this cause be remanded to the Circuit Court of Sangamon County for further proceedings in accordance with the views expressed in the opinion attached to this mandate."

■■ The general rule concerning mandates is elementary, well-known and universally recognized. It is well stated in *Thomas v. Durchslag* (1951), 410 Ill. 363, 365, 102 N.E.2d 114, 115:

> "Where, as here, the directions of a reviewing court are specific, a positive duty devolves upon the court to which the cause is remanded to enter an order or decree in accordance with the directions contained in the mandate. Precise and unambiguous directions in a mandate must be obeyed."

See also *Roggenbuck v. Breuhaus* (1928), 330 Ill. 294, 161 N.E. 780.

In the ordinary case such a rule poses no problem; the paucity of cases on the subject shows that it seldom arises. But *Boner* is not an ordinary case. Indeed, Justice Schaefer, the author of the opinion, characterizes it as "unique." The opinion covers nine pages in the Official Reports, yet

appellants find the necessary precision in part of a single sentence in the last paragraph: "* * * to determine the score of each of the replacement employees upon the qualifying examination* * *" which they label as "clear and simple." Such a fine focus is warranted neither by law nor by common sense. The mandate is for further proceedings in accordance with the entire opinion, not in accordance with a few words wrested out of context.

*Roggenbuck* is more in point. There the supreme court said:

> "When a judgment is reversed and the cause remanded with directions to proceed in conformity to the opinion then filed, and it appears from the opinion that the grounds of reversal are of a character to be obviated by subsequent amendment of the pleadings or the introduction of additional evidence, it is the duty of the trial court to permit the cause to be re-docketed and then to permit amendments to be made and evidence to be introduced on the hearing just as if the cause was then being heard for the first time." 330 Ill. 294, 298, 161 N.E. 780, 782.

As we have already stated, but wish to emphasize again, the supreme court had before it a summary judgment with only an abbreviated record; the appellant was interested in only one thing, to establish the extension of the Personnel Code into the Secretary's office; the Director of Personnel was not even a party to the appeal to defend his method of scoring. Quite clearly, everyone, including the supreme court, was looking only at the tip of the iceberg if in fact anyone recognized it as an iceberg.

The trial court's primary reason for granting summary judgment and issuing the permanent injunction was his finding that the extension of the Code was unconstitutional; the violation of section 4b was added as an alternative only; and the supreme court treated the matter in just that fashion. It disposed of the constitutional argument with dispatch and then turned its attention to the question of section 4b, saying:

> "We agree with the trial judge that these explanations are weak, and they do not justify the failure to comply more closely with the statute. We do not agree, however, that it necessarily follows that the entire process involving the extension of the Code to the office of the Secretary of State is therefore void." *Boner,* 60 Ill. 2d 532, 541, 328 N.E.2d 548, 553.

Thus, in speaking of the "entire process," the court opened up the whole question of the defective scores and the methods of scoring and reinforced the proposition by directing the trial court to make an "examination" and to "fashion its remedy." The court's concern with section 4b is amply demonstrated by its repeated reference to it. Ascertainment of compliance with section 4b would be a legal and logical impossibility without examination and investigation.

■■ We conclude that the trial court was required to hold the necessary evidentiary hearings under the mandate.

■■ Turning next to some of the specific complaints of appellants, we find that the manifest weight of the evidence supports the trial court's conclusions. We have already set forth a synthesis of the evidence as it relates to Groups C and D. Under that evidence it was literally impossible for the trial court to establish a cutting score for these groups. If he had done so, it would have been an egregious and flagrant violation of section 4b. Quite obviously, the Department of Personnel has much homework to do in this area.

As to Group B, The Director of Personnel cannot now be heard to complain that the court assumed jurisdiction and made findings. It was at his request that the trial court conducted the audit; he prepared the report on this group, thus destroying his neutrality as to the final determination. Furthermore, the record shows that the court was reclassifying people, not positions.

The intervening defendants-appellants are in no position to complain generally about Group B, but only about the action regarding one of their number, Thiemes. In his report the Director of Personnel admitted that Thiemes was classified as Administrative Assistant II, but that he should have been classified as Executive I and that it was for Executive I that the TRAEX examination had been given. Thiemes argues that he is qualified for Administrative II and had he been given the TRAEX therefor, he would have passed. This is pure speculation and would lead to administrative chaos. The position and the examination must be complimentary and co-extensive. Though he may be qualified, Thiemes should not be allowed to occupy a position for which he has not been tested.

■■ The trial court committed no error in its handling of Group B or Mr. Thiemes.

Some minor complaints were made concerning the elimination of chief administrative officers and department heads. It would be futile for the trial court to attempt a cutting score in those cases since the record showed that there are no examinations for them.

Appellants have raised two other issues which will be briefly dealt with. First, they contend that the trial court violated the law of the case. Since we have already determined that the trial court's actions were within the scope of the mandate, we need not discuss this doctrine.

■■ Appellants further contend that the doctrine of *res judicata* applies. As has already been pointed out, the Illinois State Employees Association withdrew before action was taken on the remand and Peterson, *et al.*, were permitted to intervene. Thus there is a difference in parties. Furthermore, the supreme court did not find all examinations to be valid as a matter of

law and thus there is a difference in issues. *Res judicata* is inapplicable.

We believe that the trial court performed well when given an almost insuperable task. The remand directed compliance with section 4b, yet in some respects, rejected here for reasons already set forth, seemed to advocate a simplistic, ministerial act. In our opinion the trial court did "fashion its remedy in a manner * * * in keeping with the rights and expectations of the individuals whose lives will be affected by its decision." *Boner v. Jones,* 60 Ill. 2d 532, 541, 328 N.E.2d 548, 553.

The decision and order of the circuit court of Sangamon County are affirmed.


Affirmed.

TRAPP, J., concurs.


Mr. PRESIDING JUSTICE GREEN, concurring in part and dissenting in part:

I fully agree with the majority that the task imposed upon the trial judge by the mandate of the court turned out to be most difficult and that he strove conscientiously to follow the mandate. I cannot agree, however, that he followed the mandate in ruling the qualifying tests administered to be invalid.

The supreme court recognized that the case concerned the transition of the employment practices of a State office from the traditional system of employment based largely upon patronage to one of civil service. It recognized that the contending individuals were persons who had apparently received original appointment under a patronage system. The court ruled that the procedure used by the Department of Personnel in waiting until the examinations had been completed before fixing a cutting score and then determining a cutting score grossly below the level set for open competitive examinations was improper and stated that the reasons given for using the method adopted did "not justify the failure to *comply more closely* with the statute." (Emphasis added.) The language used indicated that a complete compliance was not required.

The equitable solution mandated was premised upon the proposition that from the perspective of the persons who took the qualifying test, "the examination they took was legal." The further proceedings directed were for the trial court to compare the scores received by the employees on the qualifying examination with the cutting scores for similar position in other departments, if such existed, and, if not, with cutting scores for open competitive examinations for the same position in the Secretary of State's office. If the score received equalled or exceeded the appropriate cutting

score and the employee had satisfactorily completed his probationary period, the trial court was to order that the employee be "certified in accordance with section 4b."

I do not interpret the direction that the certification be "in accordance with section 4b" to mean that the trial court was to order certification only if section 4b had been complied with. The implication of earlier language in the opinion was that full compliance with the section was not required. I interpret the reference to section 4b to mean that the certification provided for there was the certification the employee was to receive. Interpreting the mandate to permit further inquiry into the validity of the qualifying tests to see if section 4b was complied with destroyed the premise that the employees taking the qualifying tests were entitled to rely on the assumption that the tests were valid and, thus, cut at the heart of the equitable remedy directed.

The mandated comparison of scores was a hard task. Because no numerical scores were available as to group "B", I agree with the majority that certification could not be ordered as to any in that group. Some comparison of scores could have been made in the "C" and "D" groups. In some cases it would be necessary to adjust the scores received to take into account that more or less questions were asked in the tests to which comparison was made. I do not interpret the supreme court to rule that certification should be denied if the tests taken were too easy. Rather, I interpret the opinion to state that giving some advantage to the incumbents in keeping with their "expectations" would be permissible.

I would affirm the order of the trial court as to the persons in groups "A", "B", and "E" and reverse and remand as to the rest. In regard to group "C" and "D" I would direct that the trial court make a comparison between the qualifying examination score and the appropriate cutting score if any are available. Adjustment should be made to accommodate for the number of questions involved in the respective tests. If the adjusted qualifying score equals or exceeds the appropriate score and the employee has served the required probationary period, certification should be ordered. The original judgment of the trial court should be entered as to all others in groups "C" and "D", those for whom no numerical comparison can be made and those whose adjusted qualifying score does not equal the appropriate cutting score.